CARMEN CENTRALE, INC., Petitioner and Appellant, v. SOL LUIS DESCARTES, SECRETARY OF THE TREASURY OF PUERTO RICO, Respondent and Appellee.

No. 10836. Argued May 4, 1953.—Decided August 7, 1953.

---

*James R. Beverley, José López Baralt, Horacio Franceschi* and *Juan A. Faría,* for appellant. *José Trías Monge, Attorney General,* and *J. C. Santiago Matos, Assistant Attorney General,* for appellee.

Mr. Justice Ortiz delivered the opinion of the Court.

In 1946 the appellant corporation, Carmen Centrale Inc., sold 5,653 shares which it had of the Finlay Bros. and Waymouth Trading Co., for the price of $1,272,151.12, that is, at the rate of $225.04 per share. The Secretary of the Treasury of Puerto Rico notified the appellant, with respect to that same year 1946, of a deficiency in its income tax amounting to $225,352.82, which flows, almost in its entirety, from a determination made by the Secretary of the Treasury to the effect that in the sale of the shares made in 1946 by appellant it had realized a taxable gain of $494,082.52. After a hearing, the former Tax Court decided that in effect the taxpayer had realized a taxable gain as the result of the sale, but that gain was $450,182.51. Carmen Centrale, Inc., has appealed from this decision. The gist of the controversy before us is whether or not in the light of the pertinent provisions of our Income Tax Act appellant received taxable income.

The shares involved in this appeal are derived from the total amount of 5,853 shares of the Finlay company acquired by appellant (that is, Carmen Centrale) from Manuel González on October 13, 1931. The value of these shares, when acquired in 1931, was also fixed at $225.04 per share and it is precisely on this ground that the Carmen Centrale alleges that it did not realize any taxable gain on the sale of the shares in 1946, explaining that it bought the shares from González in 1931 and sold them at the same price in 1946.

On the other hand, the respondent court maintained that under §§ 5, 6 and 7 of the Income Tax Act, the basis for determining and computing the taxable gain of the Carmen Centrale on the sale made in 1946 should not be the cost or value of the shares when they were acquired from González in 1931, but the cost of those shares to the transferor, that is, to Manuel González, prior to 1931, in other words, before he transferred them to the Centrale. Before starting on the discussion of the main problem submitted to our consideration, we must necessarily describe the transaction that took place between Carmen Centrale and Manuel González in 1931, inasmuch as the terms and conditions of this transaction constitute the crux and vital nerve of the controversy.

Prior to 1931 and through the transactions which we shall describe, Manuel González was the sole and exclusive owner of the entire assets and property of the sugar business of the sugar corporation Carmen Centrale, Inc., including all the shares of the Finlay corporation to which we have referred. As owner of these assets, Manuel González had also contracted debts connected with the business of the Carmen Centrale, amounting to $2,647,035.80. On October 13, 1931 Manuel González transferred to the Carmen Centrale all his assets in connection with the sugar business of the Centrale, which amounted to $2,677,035.80, including the shares of the Finlay Co., in exchange for $28,500 in shares of the Centrale, $1,500 in cash and in addition in exchange for the creation of an obligation on the part of the Centrale to assume the indebtedness of González, that is, the Centrale assumed the obligation to pay the indebtedness, amounting, as we have seen, to $2,647,035,80. As the result of this transaction, Manuel González secured the control of 95% of the shares of the Carmen Centrale.

Section 5 (a) of the Income Tax Act, to which we shall hereinafter refer to as "the Act," is applicable to the sale

of shares made in 1946 by the Centrale which gave rise to the determination of the deficiency. That Section provided as follows:

"Except as hereinafter provided in this section, the gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the basis provided in subdivisions (a) or (b) of section 7, and the loss shall be the excess of such basis over the amount realized."

The essential question in this case consists in determining the basis for computing any possible gain. If the basis to be used is the cost or value of the shares acquired by Carmen Centrale from Manuel González in 1931, then there would be no taxable excess or gain, since the cost of the shares in the transaction of 1931 coincides with the selling price of the shares in 1946. But if the basis to be used is the cost to Manuel González prior to 1931, then the situation would be different, and the judgment of the court would be correct. Let us see.

Section 7(a)(8) of the Act is applicable to the present case. It provides:

"Section 7.—(a) The basis for determining the gain or loss from the sale or other disposition of property acquired after February 28, 1913, shall be the cost of such property; except that—

". . . . . . . .

"(8) If the property (other than stock or securities in a corporation a party to a reorganization) was acquired after December 31, 1923, by a corporation by the issuance of its stock or securities in connection with a transaction described in paragraph 4 of subdivision (b) of section 6 (including also, cases where part of the consideration for the transfer of such property to the corporation was property or money in addition to such stock or securities), *then the basis shall be the same as it would be in the hands of the transferor,* increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made; . . ." (Italics ours.)

The above quoted paragraph adopts by reference the definition contained in par. 4 of subdivision (b) of § 6, which paragraph provides thus:

"Section 6.— (a) Upon the sale or exchange of property the entire amount of the gain or loss, determined under section 5, shall be recognized, *except* as hereinafter provided in this section.

"(b).              .          .          .          .          .

"(4) No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange." (Italics ours.)

If § 7 (a) (8) were applicable, the basis as to the sale of the shares in 1946 would become the same as it would be in the hands of the transferor, that is, in the hands of Manuel González, regarding the latter as transferor of the shares to the Carmen Centrale in 1931. Pursuant to § 7 (a) the basis for computing the gain on a sale shall be, as a general rule, the cost of the property to the vendor taxpayer, that is, to the Centrale, as to the sale made in 1946. But § 7 (a) itself provides: "except" as provided in several subsequent paragraphs, including 7 (a) (8). In other words, § 7 (a) (8) establishes an exception to the general rule, indicating that, under the circumstances listed in par. 8, the basis shall not be the cost of the property to the taxpayer in the transaction sought to be taxed, but the basis shall be the same as it would be in the hands of the transferor of the property to the taxpayer, that is, the cost of the property to the transferor, the person who originally transferred the property to the taxpayer, who in this case is Manuel González. Mertens, Law of Federal Income Taxation, Vol. 3, p. 359, chapter 21.02; *Cf. Schweitzer & Conrad, Inc.,* 41 B.T.A. 533, 547. See, also, the cases of *Birren & Son* v. *Commissioner of Inter-*

*nal Revenue*, 116 F. 2d 718; *Symington & Son, Inc.*, 35 B.T.A. 711; *Thompson Securities Corp.*, 33 B.T.A. 1011, 1020; *Lanova Corp.*, 17 Tax Court 1178, decided in 1952, and cited in 26 U.S.C.A., § 113, 1952 Supplement.

We shall examine the applicability of § 7 (*a*) (8). The shares in question do not belong to a corporation subject to a plan of reorganization. They were acquired after December 31, 1923, by a corporation, the Carmen Centrale, by the issuance of its stock or securities. With respect to the reference made in § 7(*a*) (8) of § 6(*b*) (4), Manuel González, by virtue of the transaction of 1931, remained in control of the corporation and although Manuel González did not transfer any property to the Centrale, "solely in exchange for stock or securities in such corporation" (§ 6(*b*) (4)), however, § 7(*a*) (8) after referring to the transaction described in § 6(*b*) (4) adds: "including also, cases where part of the consideration for the transfer of such property to the corporation was property or money in addition to such stock or securities." Now, part of the price of the exchange made en 1931 between Manuel González and the Centrale was $1,500 in cash paid by the Centrale to Manuel González, and in addition the obligation assumed by the Centrale to pay the indebtedness of González in connection with the business transferred. The obligation assumed by the Carmen Centrale to pay the debts of González was analogous to the accrual of a gain to González, and was tantamount to the acquisition of property by González in his relations with the Carmen Centrale. *United States* v. *Hendler*, 303 U.S. 564; *Old Colony Trust Co.* v. *Commissioner*, 279 U.S. 716; *United States* v. *Boston & Maine Ry.*, 279 U.S. 732; Eicholz: "Some Tax Risks in Assumption of Liability" 22 Corn. L. Q. 543; Surrey, "Assumption of Indebtedness in Tax Free Exchanges," 50 Yale L. J. 1, 5; *Brons Hotels Inc.*, 34 B.T.A. 376; *Walter F. Haass*, 37 B.T.A. 948; Prentice-Hall, 1953 Federal Tax Service, Vol. 1, § 10,275; 3 Mertens, *op. cit.*, § 20.107, p. 307. The assumption of this obligation constituted

"property or money" to González within the meaning of § 7 (*a*) (8), insofar as he acquired a personal right against Carmen Centrale in order that the latter could pay his indebtedness, this right being operative only between the parties to the contract, that is, between González and Carmen Centrale, even if the assumption of this obligation would not have a fair market value, as we shall see, and would not be operative as to the creditors, because the latter did not consent to the change in the personality of their debtor.

We have already seen that, after having complied with the requirements of § 7 (*a*) (8), the basis shall be the cost to the original transferor. But § 7 (*a*) (8) further provides that the basis shall be "increased in the amount of *gain* or decreased in the amount of loss *recognized to the transferor* upon such transfer under the law applicable to the year in which the transfer was made." (Italics ours.) This last clause introduces the concept of the readjusted basis, that is, in order to determine the taxable gain of Carmen Centrale on the sale of the shares in 1946, this taxable gain shall be fixed by the difference between the selling price in 1946 and the original cost of the shares to González, adding to this cost or basis the sum received by González as gain recognized by law as taxable (to him) in selling the shares to the Carmen Centrale in 1931. Section 6 refers to those gains which, by express statutory provision, are not recognized as taxable and are tax-free exchanges. All those gains not included in the exceptions listed in § 6 should be considered as taxable. For this reason when § 7 (*a*) (8) provides that the basis in the hands of the transferor shall be increased in the amount of gain recognized to him by law, the question of whether the transferor had originally obtained a taxable gain, recognized to him as taxable, should be determined in the light of § 6. Stating these concepts more concretely, as they apply to the present case, it appears from the findings of fact made by the trial court and from the evidence introduced, as we shall see, that the original cost of each share of the Finlay

Co., paid by González was $145.404. He sold the shares to the Carmen Centrale in 1931 at the rate of $225.04 per share, realizing a profit of $79.636 per share. The Carmen Centrale sold those same shares in 1946 at the rate of $225.04 per share, that is, at the same price at which it purchased them from González in 1931. If the taxable basis to be used with respect to the sale in 1946 were the cost of the shares to the Carmen Centrale in 1931, the latter would not be obtaining any taxable gain, inasmuch as the selling price ($225.04) would be identical with the price it paid in 1931. But we have already seen that under § 7 (a) (8) the basis as to the sale in 1946 was not the cost to Carmen Centrale but the cost to González, the transferor, that is, $145.404. Up to that point the taxable gain per share of the Carmen Centrale in 1946 would be measured by the difference between $225.04 which is the selling price and $145.404, the cost to González, which is $79.636. But § 7 (a) (8) does not stop here. It adds that that basis of $145.404 should be increased by the gain of $79.636, received by González provided said gain would have been recognized to González as taxable in 1931 (under § 6). If that gain were taxable under § 6, then the sum of $79.636 would have to be added to the basis of $145.404, resulting in a readjusted basis to Carmen Centrale of $225.04, which would coincide with the selling price, whereupon Carmen Centrale would not have realized any taxable gain. But if on the other hand, pursuant to § 6, the gain obtained by González in 1931, although real, would not have been recognized as taxable, said gain could not be added to the original basis of $145.404 and the latter would remain as the basis to the Carmen Centrale, yielding to the latter with respect to the sale of 1946 a profit of $79.636 per share. The result of the entire transaction would then be that one of the interested parties would have to pay tax on the gain, either González in 1931 or the Carmen Centrale in 1946. The payment of the tax by one party exonerates the other and the exoneration of one contemplates the payment by the other.

This is precisely the philosophy of §§ 5, 6, and 7, as illustrated by Mertens, *op cit.*, Vol. 3, p. 356, chapter 21.01, as follows:

"The key which unlocks the door to understanding here is the general rule that both the taxpayer and the Commissioner are to be kept whole no matter how many transactions and permutations occur. Gain is in the end to be completely taxed once, but only once."

■ As stated in 3 Tax Law Review 351, note 2, the cardinal rule of the statutory provisions under discussion here is to preclude a stepped-up basis where the property was acquired originally in a tax-free exchange. This forces our attention on the nature of the exchange between Manuel González and the Carmen Centrale in 1931, whether or not the gain realized by González was taxable pursuant to § 6 of the Act. Section 6(a) and particularly § 6(d)(1) are applicable to the present case. These Sections provide as follows:

"'Section 6.—(a) Upon the sale or exchange of property the entire amount of the gain or loss, determined under section 5, shall be recognized, *except as hereinafter provided in this section.*

(d) (1) If an exchange would be within the provisions of paragraphs (1), (2), or (4) of subdivision (b) if it were not for the fact that the property received in exchange consists not only of property permitted by such paragraph to be received without the recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money *and the fair market value of such other property.* This paragraph shall not apply to an exchange by a corporation a party to a reorganization of property for stock or securities and other property or money in pursuance of the plan of reorganization." (Italics ours.)

In other words, in the exchange made by González in 1931, a gain would be recognized to him of "other property" (the obligation assumed by the Carmen Centrale to pay his indebtedness) and of money ($1,500), as to the fair market value

of the obligation of the Carmen Centrale to pay his indebtedness, but if this obligation should have no fair market value, no gain would be recognized to him as taxable. It follows that the assumption of this liability by the Carmen Centrale, although it constituted property to González, had no fair market value, for the following reasons:

(1) The debts of González were not actually paid by the Carmen Centrale. Many of the cases in which it has been held that the assumption of an obligation to pay debts constitutes property having a fair market value are cases in which the debts have been actually paid or in which the creditors have expressly released the debtor of all responsibility. See *United States* v. *Hendler, supra,* [1] distinguished subsequently by Judge Learned Hand in *Bickford's Inc.* v. *Helvering*, 98 F.2d 568, 569, on the ground that in the *Hendler* case the debts were paid in the taxable year; *Stevenson Consolidated Oil Co.*, 23 B.T.A. 610; *U. S.* v. *Boston & M. R. Co.*, 279 U. S. 732; *Citizens Nat. Trust & Savings Bank* v. *Welch*, 27 A.F.T.R. 1123, affirmed in 119 F.2d 717; *Anheuser -Bush Inc.*, 40 B.T.A. 1100, 1108, affirmed in 115 F.2d 662.

(2) The indebtedness assumed in this case was not of a mortgage nature and the obligation to pay those debts was not duly guaranteed, this case being therefore different from *Rubert* v. *Tax Court*, 74 P.R.R. 48 and *Brons Hotels, Inc., supra*, where it was stated that such obligation had a fair market value because it was guaranteed.

(3) Although the right acquired by González could operate exclusively against the Carmen Centrale, the latter being

---

[1] The above-cited case of *United States* v. *Hendler* dealt with the reorganization of two corporations, in which one assumed *and paid* the debts of the other. The essence of the opinion is that Hendler's debt was absolutely discharged by the payment thereof. In view of the ruling in the *Hendler* case, the United States Congress amended the Federal Income Tax Act by adding § 112(k) to restrict the doctrine of the *Hendler* case and providing that the assumption of debts should not be regarded as "property or money" in the different situations expressly enumerated in the statute. 26 USCA 112(b) (4, 5, 10); 3 Mertens, *op. cit.,* Chapter 20.107, p. 307; Prentice-Hall, *op. cit.,* § 10,275, third paragraph.

personally liable to González if it failed to fulfill its obligation to pay the indebtedness, that right was his exclusive personal right. Therefore, although it constituted his personal property in his relations with the Carmen Centrale, it did not have a fair market value, since it was not effective as to third persons nor as to the creditors of González, who had not given their consent to the assumption by the Carmen Centrale of González' obligations. Section 1159 of the Civil Code [2] provides that a novation consisting in the substitution of a debtor in the place of the original one may not be made without the consent of the creditor. Without such consent the debtor is not released as to the creditors and the substitution does not operate as to the creditors. *Ríos* v. *Rosaly*, 50 P.R.R. 652; *Bou* v. *Colorado*, 24 P.R.R. 125; *cf. Dávila* v. *Torres*, 58 P.R.R. 880. See also, 8(1) Manresa 776, 780 *et seq.*, fifth revised edition; *Revista de Derecho Privado*, Vol. 10, p. 98: *"Trasmisión de Obligaciones."* Notwithstanding this, the assumption of the indebtedness by the Carmen Centrale created a personal right in favor of González against the Carmen Centrale, even if the creditors did not give their consent, and, therefore, even if this right did not have a "fair market value" because it did not operate as to third persons and as to the creditors. In its judgment of April 12, 1945 (8(1) Manresa 291, fifth revised edition) the Supreme Court of Spain held that where a purchaser assumes the payment of the vendor's debts without the consent of the creditor it constitutes "a promise of release or personal assumption of debt, which, different from the subjective novation providing for the release of the original debtor, keeps the relation between the latter and its creditors, and at the same time gives rise to a new bond between the original debtor and the

---

[2] Naturally, taxation problems should be determined in the light of tax statutes and not the Civil Code. But to define what constitutes "property" and the validity of the transfer of said property it is proper to resort collaterally to the substantive law where the matter has not been covered by the Income Tax Act.

substitute debtor by virtue of which the latter is bound to the former, for the payment of the debts and to the possible resolution of the sale for nonperformance of the obligation contracted." This judgment has been highly commended by the commentators because it represents a realistic view. Manresa, *op. cit.* pp. 292, 293, 783, 788; the last page of which states that where the assumption takes place without the consent of the creditor, the relations between the original and the second debtor always have distinctive effects.

All this explains and reconciles the apparent dichotomy of deciding, in the first place, that the assumption of González' debts constitutes "property" of González for the purpose of applying § 7 (*a*) (8) to the determination that the sale basis in 1946 was the original cost to González in 1931 and of deciding, in the second place, that this "property" does not have a fair market value for the purposes of § 6 (*d*) (1) which provides that a gain recognized as taxable is that which is represented by a property having a fair market value, up to the amount covered by such value, that is, that if the property does not have a fair market value, the acquisition of such property shall not be recognized as taxable gain.

In brief, the assumption by the Carmen Centrale of the debts of González in 1931, was not recognized by law as a taxable gain to Manuel González and, as a matter of fact, no tax was assessed on such gain. Therefore, the sale basis in 1946 is the original cost of the shares to González without this basis being increased in the amount of the gain of González in 1931, because such gain was not taxable under § 6. Since Manuel González has not paid any tax on this gain, the Carmen Centrale must pay it. The trial court acted correctly in reaching this conclusion as to the shares.

■ The appellant contests the determination made by the trial court as to the original cost to González of the shares (145.404 per share; $851,055.36 for 5,853 shares and $821,968.81 for the 5,653 shares in question that were sold by Carmen Centrale in 1946). There is no controversy about

the fact that originally the 5,853 shares of Finlay Bros. & Waymouth Trading Co. were acquired in undivided co-ownership by Genaro Cautiño and Manuel González at the rate of $100 per share, that is, $585,300 for all of them. These shares were part of the assets of the corporation Carmen Centrale, Inc., which was in the process of dissolution and whose properties were acquired as above stated by González and Cautiño.

On August 17, 1931 Cautiño sold to González all his shares in the property acquired according to inventory of June 30, 1931. The total price stated in the deed was $1,317,295.98; of that amount $912,473.48 corresponded to the 5,853 shares of Finlay Bros., together with 764 shares of Northern Puerto Rico Railroad Co. On June 30, 1931 an entry was made in the books of González and Cautiño adjusting the shares of Finlay to $731,870.75.

We believe that the lower court acted correctly in disregarding the adjustment made in the books of González and Cautiño because the problem in the case is not the determination of the value of the shares in the books but the *cost* to González by way of the two transactions in which he acquired the right of ownership over the 5,853 shares.

According to the evidence, the condominium of Cautiño (originally equal to that of González) as to the rest of the property sold to González, which, together with the shares of the Finlay Co., amounted to $912,473.48 had a value or price (the condominium of Cautiño as to the other property) of $354,068.12. Deducting this sum from the total price of $912,473.48 there is a remainder of $558,405.36 which is the price or cost to González of the condominium that Cautiño sold to him over the Finlay shares. For his own condominium over said shares González had originally paid to the Carmen Centrale the sum of $292,650 (one half of $585,300). In order to obtain the total cost of the 5,853 shares to González we must add with respect to the shares, those $292,650, cost to González of his own condominium, and $558,405.36, cost to

González of Cautiño's condominium, which gives a total cost of $851,055.36, that is, $145.04 per share, which was the correct cost fixed by the trial court.

The lower court was not aware, erroneously, that in order to fix the readjusted basis of the sale made by the Carmen Centrale, it had to increase, pursuant to § 7(a)(8), the original cost of the shares to González, by any gain perceived by González recognized as taxable in 1931. We have noted that the gain derived from the sale of the shares was not recognized as taxable. But González also obtained from the sale $1,500 in cash, which constituted taxable gain. It was necessary to add part of those $1,500 to the original basis, that is, to the total cost of the shares to González. We must determine what part of that taxable gain of $1,500 could be chargeable to the shares finally sold by the Carmen Centrale, inasmuch as González obtained the $1,500 in partial exchange not only for the shares transferred by him to the Carmen Centrale, but also in exchange for the total assets of the business of the Carmen Centrale transferred by him to the corporation whose assets included those shares. This is accomplished by establishing a proportion [3] between the price paid by the Carmen Centrale to González for the 5,853 shares and the price of the whole assets, with respect to the $1,500 and then by readjusting the result with respect to the 5,653 shares sold which would yield a total of $712.63, that is, the portion of the $1,500 that should be added to the original basis; in other words, to the original cost to González of the 5,653 shares. In other words $821,968.81 plus $712.63 raising the readjusted basis to $822,681.44, thereby assessing an income tax on the taxable gain realized by the Carmen Centrale on the sale of the shares in 1946, that is, on the difference between the selling price of the 5,653 shares which

---

[3] The operation would be:

$$\frac{5,853 \text{ shares}: \ \$1,317,170.75}{\text{Total asset}: \ \$2,677,635.80} \times \$1,500.00$$

The result is then divided by 5,853 shares in order to find the sum for each share, which is then multiplied by 5,653 (shares).

is $1,272,151.12 and the readjusted basis of $822,681.44 which gives rise to a taxable gain of $449,469.68, which is the amount of the deficiency, instead of $450,182.31.

The judgment appealed from will be modified by fixing the sum of $449,469.68 as deficiency or taxable gain realized by appellant in 1946, and as thus modified, the judgment will be affirmed.

Mr. Justice Marrero and Mr. Justice Sifre did not participate herein.

---

ON MOTION FOR RECONSIDERATION
January 28, 1954

MR. JUSTICE ORTIZ delivered the opinion of the Court.

This case involves the determination of the taxable gain of the taxpayer Carmen Centrale, Inc., with respect to the sale by the Corporation of 5,653 shares which it had of the Finlay Bros. and Waymouth Trading Co. In our original opinion we held that the basis for determining this gain was not the cost of the shares when they were acquired from Manuel González, but their cost to the transferor, Manuel González, when he originally acquired them. Previously, 5,853 shares of the Finlay had been acquired in undivided co-ownership by Genaro Cautiño and Manuel González at the rate of $100 per share, that is, for the total sum of $585,300. On August 17, 1931 Cautiño sold his condominium to González, by virtue of a deed which we shall identify as deed No. 53, in exchange for the assumption by González of the indebtedness or obligations of the Carmen's sugar business which had been previously acquired by both.

■■ In our original opinion we held that the cost to González of the condominium that Cautiño sold to him over the shares was $558,405.36, which added to the original cost to González of his own condominium of $292,650, gives a total cost of the shares to González of $851,055.36. The Carmen Centrale prays this Court to reconsider its opinion

and judgment, basing its motion for reconsideration on the allegation that the cost to González of Cautiño's condominium was not the sum of $558,405.36 but the sum of $658,585.31. In support of its point of view, the taxpayer alleges, in brief, the following:

That on June 30, 1931, *i.e.*, before Cautiño sold to González all his shares, both co-owners had readjusted in their books the value of the Finlay shares, increasing the original cost by an increment of $731,870.75. That increment represented a surplus accrued from the gain on the Finlay shares. The taxpayer alleges that this increment of $731,870.75 should be added to the original cost of the shares to both co-owners, of $585,300.00, resulting in a total cost of $1,317,170.75, one-half of which is $658,585.37 which is the sum alleged by the taxpayer as the cost to González of Cautiño's condominium. Now then, in order to determine the basis for computing the taxable gain, the essential question to be considered is the real cost of the shares and not their intrinsic value. Although their readjusted value is $658,585.37, it does not imply that this sum was the cost to González, that is, the price that González paid for them. But the taxpayer alleges that from the deed under which Cautiño sold his condominium to González (No. 53 of August 17, 1931) and from the inventory attached therewith, it appears that this value was actually the cost to González. Let us examine the documents.

Cautiño sold to González his condominium in the properties of the Carmen Centrale, including his condominium over the shares, on August 17, 1931, by deed No. 53, after readjusting *in the books the value* of the shares. At that time the entire assets of the sugar business of the Carmen amounted to 2,677,035.80, *including the increased value of the shares*. The obligations amounted to $2,634,291, that is a difference of approximately $43,000 of the assets over the liabilities. Then in deed No. 53, from Cautiño to González, it is stated:

(1) That Cautiño sells his condominium of one-half of all the properties of the Carmen, including the 5,853 Finlay shares, that is, he sells half of the assets.

(2) That "this sale is executed for the price of $1,317, 295.98 which is one-half of the sum which represented on June 30, 1931, retroactive date for the effects of this deed, the indebtedness contracted by the parties hereto in the sugar business referred to herein *according to the balance sheet attached to this document* and ... González ... the purchaser, withholds said sum to be used in the payment of said indebtedness, which he totally assumes, as each liability becomes due, likewise binding himself to pay any other debt and obligations incurred in the aforesaid business up to the date of execution hereof although said debt or obligation does not appear in the liability memorandum attached herewith. The aforesaid liabilities include the amount which the parties hereto owe of the deferred price for which they acquired the property object of the deed of sale, this amount being evidenced by promissory notes in circulation and the purchaser binds himself to pay such promissory notes punctually on maturity, etc."

Notice should be taken before going any further, that the selling price is one-half of the obligations or liabilities, according to the balance sheet attached to the document. This attached balance disclosed a liability of $2,634,000, (one-half is $1,317,000) and there is an item included in the liabilities which reads: "Finlay Bros.... $513,558.20." Perhaps, these are not the shares, but rather the obligations of the Finlay, but that is *the sole* reference to Finlay appearing in the balance and in the inventories attached to deed No. 53.

It is further stated in the deed that "the selling price *is distributed* among the property sold as follows:

Item A

(1) Condominium in property A............ $350, 000.
(2) In property B ........................    100.

(3) In property C ..................... 14, 800.

(4) In property D ..................... 1, 400.

(5) In property E..................... 3, 000.

(6) In property F..................... 4, 500.

(7) In property G..................... 3, 600.

(8) In property H..................... 1, 500.

(9) In mortgage credits ................ 25, 922. 50"

There is an inventory attached to deed No. 53 (Cautiño to González), but in said inventory no reference is made to those properties and mortgage credits nor to their value, nor does the deed mention the inventory in relation to those properties and credits. At any rate, the total price of Cautiño's condominium in those properties and credits, as set forth in the deed, is $404,822.50, from a total of $1,317,295.

The deed further contains a second item B which includes the 5,853 Finlay shares, but *without giving a specific price for the condominium over those shares*. In said item B, a lump sum of $912,473.48 is allocated ($1,317,295 less item A of $404,822.50) to different properties which include the 5,853 shares, 764 shares of another corporation, the Northern, lease rights, franchises, contracts with farmers for planting and grinding of sugar, sugar plantations, materials and goods in stock, cattle and horses, carts, plows, tractors, farming implements, tools, fixed and portable tracks, rolling material, furniture, scales, bridges and switches, laboratory material and telephone lines and accounts and credits receivable, "*as set forth in the balance accounts and inventories attached to this deed,* in the amount of $912,473.48."

The only problem involved in the motion for reconsideration refers to how much it cost González to buy Cautiño's condominium over the shares, that is, the price of the shares between Cautiño and González. Item B of deed No. 53 states that the shares and other property have a price of $912,473.48. In the inventory attached to deed No. 53 the shares are not mentioned, nor their price established. The only thing mentioned is the price of the other properties, in

item B, $708,136.24. What the trial court did, as well as this Court in its opinion, was to deduct $708,136.24 from the total price of Item B ($912,473.43) and take the difference as the price of the shares. We believe that this was the right thing to do, on the basis of what appears from the deed and the inventory itself. Still, the taxpayer alleges that the true price of the shares was $585,300 plus the $731,000 of the previous readjustment. But, in the first place, that is not the price mentioned in the deed and in the inventory. That "cost" of the original value plus $731,000, was mentioned, not in the inventory attached to the deed between González and Cautiño, but in another subsequent deed between González and Carmen Centrale, when González sold to the Centrale, i.e., a different deed in which Cautiño did not intervene.

In the second place, the increment of $731,000 in the value of the shares refers to the value, but not to the actual price paid by González for Cautiño's condominium over the shares. It is not necessarily the cost. The price is established exclusively from deed No. 53 between Cautiño and González and from the inventory attached to that deed, which is the price stated in the opinion.

The taxpayer alleges that the prices set forth in deed No. 53 were for registration purposes. In the first place, the total price mentioned in deed No. 53 is $1,137,000, which represents half of the liabilities. This liability had always remained the same, even under the previous readjustment. So that this total price is invariable, unless they are false prices, assuming that they are and have always been so, beginning with the deed of 1927 whereby González and Cautiño bought the Carmen, i.e., that the prices in the deed of 1927 have also been false, for registration purposes. Assuming that they were always false, the taxpayer did not establish the true prices as to the other properties. Therefore, we would have to confine ourselves to what is established from deed No. 53 in question. Besides, the only recordable

properties were those indicated in item A, farms and mortgage credits. The other properties mentioned in item B except the shares, are not recordable. Therefore, it cannot be said that the total price of item B, tracks, bridges, franchises, etc., and the shares, with a total price of $912,473, has been fixed for registration purposes.

The motion for reconsideration will be denied and our judgment of August 7, 1953 ratified.

Mr. Justice Marrero and Mr. Justice Sifre did not participate herein.